Michael A. Velthoen (SBN 187909)
Leslie A. McAdam (SBN 210067)
Max R. Engelhardt (SBN 310968)
FERGUSON CASE ORR PATERSON LLP
1050 S. Kimball Road
Ventura, California 93004
Telephone: (805) 659-6800
Facsimile: (805) 659-6818
Email: mvelthoen@fcoplaw.com
lmcadam@fcoplaw.com
mengelhardt@fcoplaw.com

Michael A. Strauss (SBN 246718)
Aris E. Karakalos (SBN 240802)
STRAUSS & STRAUSS, APC
226 W. Ojai Ave. #101-325
Ojai, CA 93023
Telephone: (805) 641-6600
Facsimile: (805) 641-6607
Email: mike@strausslawyers.com
aris@strausslawyers.com

*Attorneys for Plaintiffs JAMES LEE FREEZE and GARY PFLASTER, on behalf of themselves and a class of employees and/or former employees similarly situated,*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES LEE FREEZE, on behalf of himself and a class of employees and/or former employees similarly situated GARY PFLASTER, on behalf of himself and a class of employees and/or former employees similarly situated,<br><br>Plaintiffs, | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>*DEMAND FOR JURY* |

1

2    v.

3    CHARTER COMMUNICATIONS, LLC,

4                          Defendant.

5    Plaintiffs JAMES LEE FREEZE and GARY PFLASTER, on behalf of

6    themselves and a class of employees and/or former employees similarly situated

7    ("Plaintiffs"), by and through their counsel, bring claims pursuant to the *Texas Labor*

8    *Code* and the *California Labor Code* against Defendant CHARTER

9    COMMUNICATIONS, LLC, its subsidiaries and affiliates, and alleges, upon personal

10   belief as to himself and his own acts, and as for all other matters, upon information

11   and belief, and based upon the investigation made by his counsel, as follows:

12                          **JURISDICTION AND VENUE**

13   1.    This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(a)

14   because the amount in controversy exceeds $5,000,000 and Plaintiffs are citizens of a

15   state different from the states in which the Defendant is a citizen.

16   2.    Venue is proper pursuant to 28 U.S.C. § 1391(a) and (c) because

17   Defendant is subject to personal jurisdiction in the Central District of California.

18                               **PARTIES**

19   3.    Defendant Charter Communications, LLC ("Charter") is a limited

20   liability company organized under the laws of the State of Delaware.   Charter's

21   principal place of business is at 12405 Powerscourt Drive, St. Louis, St. Louis County,

22   Missouri 63131.

23   4.    Plaintiff JAMES LEE FREEZE ("Plaintiff Freeze") is a natural person

24   and resident of Texas.  Plaintiff Freeze was employed by Charter as full-time, non-

25   exempt employee during the applicable statutory period.  Plaintiff is not subject to

26   Charter's "Solution Channel" arbitration program.  Plaintiff brings this action under

27   the *Texas Labor Code* on behalf of himself and all other similarly situated employees

28

CLASS ACTION COMPLAINT

who currently work, or who worked for Charter as Maintenance Technicians ("Maintenance Techs") in Texas during the applicable statutory period.

5.    Plaintiff GARY PFLASTER ("Plaintiff Pflaster") is a natural person and resident of California.  Plaintiff Pfalster was employed by Charter as full-time, non-exempt employee during the applicable statutory period.  Plaintiff Pflaster is not subject to Charter's "Solution Channel" arbitration program.  Plaintiff Pflaster brings this action under the *California Labor Code* on behalf of himself and all other similarly situated employees who currently work, or who worked for Charter as Maintenance Maintenance Techs in California during the applicable statutory period.

## FACTUAL BACKGROUND

6.    Charter is telecommunications and mass media company that provides cable, internet, and communications products and services throughout the United States.

7.    Plaintiffs and the class members worked in Texas and California for Charter as Maintenance Techs during the applicable statute of limitations period.  Among other duties, Maintenance Techs are responsible for responding to emergency outages in Charter's cable, internet, and communication services infrastructure.  The stakes of the job are high as a single outage may affect tens of thousands of Charter's customers.  Response time to these emergencies is a critical aspect of a Maintenance Tech's duties.

8.    As Maintenance Techs, Plaintiffs and the class members were subjected to Charter's written "on-call" corporate policy (the "On-Call Policy").  The stated purpose of the On-Call Policy was to ensure that Charter's network and systems functioned reliably at all times.  To that end, Charter required Plaintiffs and the class members to work "on-call" for designated periods in order to respond to plant and service emergencies outside of Plaintiffs' and the class members' regular 40-hour workweek schedules.  On-call work was mandatory, and according to Charter, "*an essential function of the position.  An employee's refusal or unavailability may render*

*the employee unqualified for the position*." Any employee who violated the On-Call Policy was subject to discipline by Charter *"up to and including termination of employment*."

9. Plaintiffs and the class members were assigned on-call duty according to a rotating schedule. Plaintiffs and the class members were required to be available 24 hours a day during the periods that they were on-call. Thus, Maintenance Techs assigned to week-long on-call periods worked 128 on-call hours in addition to their regular full-time 40-hour workweek.

10. Charter acknowledged and agreed that on-call duty was compensable work. Specifically, Charter paid Plaintiffs and the class members flat-rate compensation known as "On-Call Pay." On an hourly basis, On-Call Pay amounted to less than $2.00 per hour.

11. In addition to the weekly On-Call Pay, if Plaintiffs and the class members were required to actually report to a specific location while on-call, Charter paid Plaintiffs and the class members "call-out pay," which was 1.5 times their regular rate of pay. Plaintiff and the class members were often called in to report to a job site during their on-call periods, sometimes more than once per day. Getting called in was a major interruption in their day as responding to emergency outages, including travel time, almost always took over one hour, and frequently took several hours.

12. As Maintenance Techs, Charter subjected Plaintiffs and the class members to numerous restrictions while they worked on-call, including, for example:

(a) Charter required Plaintiffs and the class members to carry a cell phone at all times;

(b) Charter required Plaintiffs and the class members to always be in an area where Charter could contact them on the cell phones;

(c) Per the express language of the On-Call Policy, the response time for Plaintiffs and the class members to respond to a call from a supervisor or other Charter personnel was within 15 minutes of receiving the call;

4

(d) The On-Call Policy stated that Plaintiffs and the class members were required to report to the job site or other Charter location as soon as was "*reasonably practical after receiving the assignment*." Charter also advised Plaintiffs and the class members that they were expected to report to the site and resolve the particular outage or other emergency all within two hours. The coverage area that Plaintiffs and the class members were responsible for while on-call was expansive. Therefore, in order to be able to respond and resolve emergencies within Charter's time requirements, Plaintiffs and the class members could not travel beyond their coverage area while working on-call;

(e) Exacerbating the geographic and time constraints, Charter required Plaintiffs and the class members to be effectively <u>anchored</u> to Charter-owned vehicles the entire time that they were on-call. Specifically, if called in, Plaintiffs and the class members were required report to the site in a Charter-owned vehicle, which was a large "bucket truck" outfitted with a crane-like, mechanized aerial lift platform (the "Bucket Trucks"). The Bucket Trucks enabled Plaintiffs and the class members to perform maintenance and repair work at heights up to about 40 feet. Per Charter policy, Plaintiffs and the class members took the Bucket Trucks home with them after their regular workweek shifts, including the period during which they were on-call. Charter monitored the exact location of the Bucket Trucks at all times through the vehicles' ignition-triggered GPS system;

(f) Charter permitted Plaintiffs and the class members to drive the company-assigned Bucket Trucks for personal use during on-call periods in order to "*minimize response time*" after being called to report to a site. However, Charter did not allow Plaintiffs and the class members to use the Buckets Truck as a regular "daily driver" vehicles in order to perform

day-to-day errands and quick trips, nor was it feasible to use the large, heavy-equipment Bucket Trucks for such purposes.   The result is that, while on-call, Plaintiffs and the class members parked and kept the Bucket Trucks at their residences, and then stayed there tethered to the Bucket Trucks.  If they traveled more than a few minutes away from where the Bucket Trucks were located, they could not comply with their on-call reporting time and outage resolution obligations;

(g) Moreover, any use of the Bucket Trucks *for personal purposes* while on-call was subject to onerous restrictions and requirements.  For example, when Plaintiffs and the class members used their Bucket Trucks during on-call periods, they were required to drive <u>alone</u>.  They were "*strictly prohibited from transporting any-non employee in a Charter vehicle*," including friends or family-members;

(h) Also, every time Plaintiffs and the class members drove the Bucket Trucks while on-call after leaving them unattended, or every time that they drove the Bucket Trucks in reverse gear – whether using the Bucket Trucks in response to a "call out" from Charter *or using the Bucket Trucks for personal purposes* – Charter required the Plaintiffs and the class members to first perform a "Circle of Safety" procedure.  This extensive vehicle and safety check included "*looking under the vehicle and around the tires for children, animals or other potential hazards, signs of mechanical defects like dripping/puddle of water, oil, transmission or other fluids, and broken, loose, or missing vehicle components*.";

(i) Plaintiffs and the class members were also required to inspect the Bucket Trucks during on-call periods on a daily basis, <u>including on days which Plaintiff and the class members did not work</u> one of their regular workweek shifts.  This daily inspection requirement included visually

inspecting or testing the brakes, steering, lights, wipers, body damage, glass breakage, or other necessary equipment;

(j) Plaintiffs and the class members were also required, on a daily basis, and even on days in which they did not work one of their regular workweek shifts, to maintain the Bucket Trucks in a "*neat and clean*" condition by, among other things, disposing of all *"[e]xcessive trash (fast food bags, soft drink cans, coffee cups, candy bar wrappers, etc*." No trash was allowed to be left in the open truck beds or on the aerial lift units.

(k) Further, at all times, Charter required Plaintiffs and the class members to comply with Charter's Motor Vehicle Policy. As such, whenever Plaintiffs and the class members drove the Bucket Trucks while on-call, whether it was for a "call out" or for personal purposes, Plaintiffs and the class members were prohibited from doing the following:

- keeping non-Charter-issued tools or equipment in the Bucket Trucks;
- eating anything;
- making outgoing cell phone calls while driving, including personal calls. They were required to pull over to the side of the road to make the outgoing call, even if they had the capability to make the call using hands-free technology;
- keeping a wireless device on the center console or otherwise "unsecured";
- using a GPS device that required them to physically tap the device;
- using a radar detector;
- transporting firearms, fireworks, or flammable liquids;
- smoking or using smokeless vapor tobacco products; and
- parking the Bucket Trucks on private property other than Plaintiffs' or the class members' own private property. Thus,

Plaintiffs and the class members could only park the Bucket Trucks on public streets when they used them for personal purposes while on-call. Further, when they parked the Bucket Trucks on these public streets, Plaintiffs and the class members were required by Charter to place orange safety cones around the perimeter of the vehicles.

(l) If involved in any accident in the Bucket Trucks during the on-call periods, even on days when they did not work one of their regular workweek shifts, Plaintiffs and the class members were required to submit to a drug and alcohol test within 24 hours. Charter further required Plaintiffs and the class members to "*not admit responsibility for a vehicle accident to any person*" including to law enforcement, even if the accident had been their fault;

(m) In addition to the required "Circle of Safety" check, every time Plaintiffs and the class members left a Bucket Truck unattended, they were required to always lock all doors and equipment containers and ensure that all applicable safety procedures had been followed, and to remove all personal articles from the vehicles or hide the articles from view;

(n) Charter also required Plaintiffs and the class members to always report to a job site in uniform. Because of this restriction, Plaintiffs and the class members had to either wear their uniforms while on-call or always carry their uniforms with them and have them at their immediate disposal so that he had the ability to quickly change if called out; and

(o) Charter also required Plaintiffs and the class members to always remain in the physical and mental condition that was expected during regular work hours, which effectively prohibited them from drinking alcohol, taking sleep aids and various other medications, or engaging in any other activity that might affect their physical or mental condition.

CLASS ACTION COMPLAINT

13.    As stated, during the on-call periods, Plaintiffs and the class members were required to work on-call every hour outside of their regular work shift.  Despite Charter's agreement that on-call time was compensable working time, and the excessive and highly restrictive degree of control exercised by Charter during the on-call periods, Charter only paid Plaintiffs and the class members flat rate compensation which amounted to less than $2.00 per hour.  This rate was far below the minimum wage and overtime rates of pay required under the both the *Texas Labor Code* and the *California Labor Code*.

14.    Apart from violating minimum wage and overtime laws with regard to on-call hours, Charter failed to pay minimum wage and overtime compensation for the work that Plaintiffs and the class members performed in connection with maintaining, inspecting, and safeguarding the Bucket Trucks and adhering to Charter's Motor Vehicle Policy.  For example, Charter required Plaintiff and the class members to perform a "Circle of Safety" inspection every time they drove the Bucket Truck, even on days that they did not work one of their regular workweek shifts and/or while they were on-call and using the Bucket Trucks for personal purposes. This was work in excess of their regular 40-hour workweek for which they received no overtime compensation.   In addition, Charter required Plaintiffs and the class members to perform *daily* maintenance and safety inspections and cleaning of the Bucket Truck, even on days that they did not work one of their regular workweek shifts.  This was also work in excess of Plaintiffs and the class members' regular 40-hour workweek for which they did not receive minimum wage and/or overtime compensation.

## **TEXAS STATE LAW CLASS ACTION ALLEGATIONS**

15.    Plaintiff Freeze brings claims under the *California Labor Code* on his own behalf and as a class action pursuant to Rule 23 of the *Federal Rule of Civil Procedure*.

16.    Plaintiff Freeze seeks to represent a class that consists of all current and former Charter employees who worked in Texas and who, within the applicable

limitations period(s): (i) held one or more of the following positions: Maintenance Tech I, Maintenance Tech II, and/or Maintenance Tech III; (ii) are not subject to Charter's "Solution Channel" arbitration program; (iii) were assigned a Charter-owned bucket truck; (iv) and who, on one or more occasion, worked "on-call."

17.    The statewide class is so numerous that joinder of all members is impracticable.  On information and belief, the total number of putative class members for the statewide class is at least 100 individuals.

18.    There are numerous and substantial questions of law and fact common to members of the statewide class including, but not limited to, the following:

   a.  Whether Charter failed to properly compensate class members for all the work that Charter required, encouraged or permitted class members to perform;

   b.  Whether Charter failed to pay class members all compensation, including minimum wages and overtime wages, rightfully owed;

   c.  Whether Charter failed to timely pay all wages due to the Maintenance Techs;

   d.  Whether Charter's payment of On-Call Pay to Maintenance Techs pursuant to its On-Call Policy violates the Texas minimum wage laws;

   e.  Whether Charter willfully failed to comply with the Texas wage laws; and

   f.  Plaintiff anticipates that Charter will raise defenses that are common to the class.

19.    Plaintiff Freeze will fairly and adequately protect the interests of the statewide class.  Plaintiff Freeze has retained experienced counsel that are competent in the prosecution of complex litigation and who have experience acting as class counsel specifically in wage and hour litigation.

CLASS ACTION COMPLAINT

20.    The claims asserted by Plaintiff Freeze are typical of the class members he seeks to represent.  Plaintiff Freeze has the same interest and suffer from the same injuries as the class members.

21.    Upon information and belief, there are no other class members who have an interest individually controlling the prosecution of his or her individual claims.

22.    In addition, the numerous common questions of law predominate over individual questions because Charter's alleged underlying activities and impact of its policies and practices affected class members in the same manner: they were subjected to the same policy of suffering and performing work in excess of 40 hours per work week without receiving their duly-earned overtime premium wages, and suffering and performing work without receiving their duly-earned minimum wages.

23.    A class action is superior to other available means for the fair and efficient adjudication of this controversy because the individual joinder of the parties is impracticable.  Class action treatment will allow a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of effort and expenses if these claims were brought individually.  Moreover, the expenses and burden of individual litigation would make it difficult for plaintiffs to bring individual claims. The presentation of separate actions by individual class members could create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for Charter and/or substantially impair or impede the ability of class members to protect their interests.

24.    Without a class action, Charter will likely retain the benefit of its wrongdoing and will continue a course of action, which will result in further damages to the Plaintiff and the class members.

**CALIFORNIA STATE LAW CLASS ACTION ALLEGATIONS**

25.    Plaintiff Pflaster brings claims under the *California Labor Code* on his own behalf and as a class action pursuant to Rule 23 of the *Federal Rules of Civil Procedure*.

CLASS ACTION COMPLAINT

26. Plaintiff Pflaster seeks to represent a class that consists of all current and former Charter employees who worked in California and who, within the applicable limitations period(s): (i) held one or more of the following positions: Maintenance Tech I, Maintenance Tech II, and/or Maintenance Tech III; (ii) are not subject to Charter's "Solution Channel" arbitration program; (iii) were assigned a Charter-owned bucket truck; (iv) and who, on one or more occasion, worked "on-call."

27. The statewide class is so numerous that joinder of all members is impracticable. On information and belief, the total number of putative class members for the statewide class is at least 100 individuals.

28. There are numerous and substantial questions of law and fact common to members of the statewide class including, but not limited to, the following:

  a. Whether Charter failed to properly compensate class members for all the work that Charter required, encouraged or permitted class members to perform;

  b. Whether Charter failed to pay class members all compensation, including minimum wages and overtime wages, rightfully owed;

  c. Whether Charter failed to compensate class members for all work performed in excess of 40 hours per work week with overtime premium wages;

  d. Whether Charter failed to timely pay all wages due to the Maintenance Techs;

  e. Whether Charter's payment of On-Call Pay to Maintenance Techs pursuant to its On-Call Policy violates the California minimum wage and overtime laws;

  f. Whether Charter willfully failed to comply with the California wage and overtime laws; and

  g. Plaintiff anticipates that Charter will raise defenses that are common to the class.

CLASS ACTION COMPLAINT

29.     Plaintiff Pflaster will fairly and adequately protect the interests of the statewide class.  Plaintiff Pflaster has retained experienced counsel that are competent in the prosecution of complex litigation and who have experience acting as class counsel specifically in wage and hour litigation.

30.     The claims asserted by Plaintiff Pflaster are typical of the class members he seeks to represent. Plaintiff Pflaster has the same interest and suffer from the same injuries as the class members.

31.     Upon information and belief, there are no other class members who have an interest individually controlling the prosecution of his or her individual claims.

32.     In addition, the numerous common questions of law predominate over individual questions because Charter's alleged underlying activities and impact of its policies and practices affected class members in the same manner: they were subjected to the same policy of suffering and performing work in excess of 40 hours per work week without receiving their duly-earned overtime premium wages, and suffering and performing work without receiving their duly-earned minimum wages.

33.     A class action is superior to other available means for the fair and efficient adjudication of this controversy because the individual joinder of the parties is impracticable.  Class action treatment will allow a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of effort and expenses if these claims were brought individually.  Moreover, the expenses and burden of individual litigation would make it difficult for plaintiffs to bring individual claims. The presentation of separate actions by individual class members could create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for Charter and/or substantially impair or impede the ability of class members to protect their interests.

34.     Without a class action, Charter will likely retain the benefit of its wrongdoing and will continue a course of action, which will result in further damages to the Plaintiff and the class members.

CLASS ACTION COMPLAINT

# COUNT I

## VIOLATION OF TEXAS LABOR CODE § 62.051
## Failure to Pay Minimum Wage
## (Against Defendant Charter Communications, LLC)

33.     Plaintiff Freeze and the class reallege and incorporate by reference the allegations of the above-numbered paragraphs as through fully set forth herein.

34.     Charter dictated, controlled and ratified the wage and hour and all related employee compensation policies.

35.     Charter classified Plaintiff Freeze and the class as non-exempt under Texas law and paid them on an hourly rate.

36.     Texas law requires payment of at least the federal minimum wage set forth in the Fair Labor Standards Act ("FLSA") for all hours worked by non-exempt employees. (See Tex. Lab. Code, § 62.051.)

37.     Plaintiff Freeze and the class regularly worked hours for which they were not paid the FLSA-mandated minimum wage.

38.     Instead of paying Plaintiff Freeze and the class proper minimum wages, Charter paid Plaintiff Freeze and the class flat compensation known as "on-call pay." Charter's agreement to pay Plaintiff Freeze and the class "on-call pay" was a tacit admission by Charter that the on-call time was compensable working time.

39.     In addition, Plaintiff Freeze and the class were highly restricted while on-call. During their on-call weeks, Plaintiff Freeze and the class spent every minute outside of their regular full-time work schedules working on-call.  Among other restrictions, they could not leave their coverage areas and they had to immediately respond to calls and immediately travel to job sites (in uniform) in order to resolve the emergencies within Charter's two-hour time requirement.  Adding to these excessive geographic and unduly restrictive fixed time limit restrictions, Charter required Plaintiff Freeze and the class to be anchored to the Bucket Trucks.  They had to stay

14

with their trucks (or be no more than a few minutes away) at all times. In effect, this restriction confined them to their homes where the trucks were parked, or to the immediate vicinity, and it was akin to an on-premises living requirement. When Plaintiff Freeze and the class used the Bucket Trucks for personal purposes, they were required to adhere to numerous restrictions including, among other things: that they travel alone; that they refrain from eating; that they pull over before making outgoing telephone calls (even if they had hands-free capability); and that they perform extensive maintenance and safety checks <u>every time</u> they began driving the trucks or <u>any time</u> that they drove in reverse gear. Further, Plaintiff Freeze and the class were required to conduct inspections on the trucks and maintain them on a daily basis, even on days on which they did not work one of their regular workweek shifts, including days on which they were not on-call.

40.    For the week-long periods that Plaintiff Freeze and the class worked on-call, the time that they worked on-call was compensable at the minimum wage set forth in the FLSA.

41.    Further, Plaintiff Freeze and the class took the Bucket Trucks home after every shift, even when they were not working on-call. When Plaintiff Freeze and the class took the Bucket Trucks home, Charter required them to perform "Circle of Safety" inspections: (1) <u>every time</u> they drove the Bucket Trucks after leaving them unattended; or (2) <u>any time</u> they drove in reverse gear. All such "Circle of Safety" inspections conducted outside of their regularly-scheduled work shifts was compensable at the minimum wage set forth in the FLSA. Likewise, Charter's requirement that Plaintiff Freeze and the class perform daily maintenance and safety inspections and cleaning of the Bucket Trucks outside of their regularly-scheduled work shifts was additional work that was compensable at the minimum wage set forth in the FLSA.

42.    At all times relevant hereto, Charter failed to pay Plaintiff Freeze and the class minimum wage compensation in violation of *Texas Labor Code* section 62.051.

CLASS ACTION COMPLAINT

Through its actions, policies and practices, Charter violated the *Texas Labor Code* by regularly and repeatedly failing to compensate them for hours worked at the proper rate of pay. Plaintiff Freeze and the class seek such minimum wages owed to them for the applicable statutory period measured backward from the date of the filing of the initial Complaint in this matter.

43. The exact amount of minimum wages owed will not be fully ascertained until discovery is completed. Until Defendant produces the necessary documents for an accounting, Plaintiff Freeze and the class are unable to determine the exact amount of said wages.

44. Plaintiff Freeze and the class seek all applicable statutory interest on all minimum wages owed to them for the applicable limitations period measured backward from the date of the filing of the initial Complaint in this matter.

45. Pursuant to *Texas Labor Code* section 62.205, Plaintiff Freeze and the class are entitled to recover attorney's fees and costs.

46. Plaintiff Freeze and the class also seek liquidated damages in an amount equal to the minimum wages due to them under *Texas Labor Code* section 62.201.

47. As a direct and proximate cause of Charter's unlawful conduct, Plaintiff Freeze and the class have suffered and will continue to suffer damages in amounts which are presently unknown to Plaintiff Freeze and the class but which exceed the jurisdictional limits of this Court, and which will be ascertained according to proof at trial.

## COUNT II

### VIOLATION OF CALIFORNIA LABOR CODE §§ 510, 1194, 1197, 1198
### Failure to Pay Minimum Wage and Overtime/Double-Time Wages
### (Against Defendant Charter Communications, LLC)

48. Plaintiff Pflaster and the class reallege and incorporate by reference the allegations of the above-numbered paragraphs as through fully set forth herein.

49. Charter dictated, controlled and ratified the wage and hour and all related

employee compensation policies.

50. Charter classified Plaintiff Pflaster and the class as non-exempt under California law and paid them on an hourly rate.

51. California law requires payment of at least the state-mandated minimum wage for all hours worked by non-exempt employees. (See Cal. Lab. Code, §§ 1194, 1197.) Hourly wages cannot be averaged out to cover hours worked during which no compensation was paid. (See *Armenta v. Osmose* (2005) 135 Cal.App.4th 314, 322-24.)

52. Plaintiff Pflaster and the class regularly worked hours for which they were not paid the state-mandated minimum wage.

53. *California Labor Code* § 510 codifies the right to overtime compensation at the rate of one and one-half times the regular rate for all hours worked in excess of eight (8) hours in a day or forty (40) hours in a work week, and to overtime compensation at twice the regular rate of pay for hours worked in excess of twelve (12) hours in a day or in excess of eight (8) hours in a day on the seventh day of work in a particular week.

54. Plaintiff Pflaster and the class regularly worked overtime and double-time hours for which they were not paid the state-mandated overtime and double-time wages.

55. Instead of paying Plaintiff Pflaster and the class proper minimum wages and overtime/double-time wages, Charter paid Plaintiff Pflaster and the class flat compensation known as "on-call pay." Charter's agreement to pay Plaintiff Pflaster and the class "on-call pay" was a tacit admission by Charter that the on-call time was compensable working time.

56. In addition, Plaintiff Pflaster and the class were highly restricted while on-call. During their on-call weeks, Plaintiff Pflaster and the class spent every minute outside of their regular full-time work schedules working on-call. Among other restrictions, they could not leave their coverage areas and they had to immediately

CLASS ACTION COMPLAINT

respond to calls and immediately travel to job sites (in uniform) in order to resolve the emergencies within Charter's two-hour time requirement.  Adding to these excessive geographic and unduly restrictive fixed time limit restrictions, Charter required Plaintiff Pflaster and the class to be anchored to the Bucket Trucks.  They had to stay with their trucks (or be no more than a few minutes away) at all times.  In effect, this restriction confined them to their homes where the trucks were parked, or to the immediate vicinity, and it was akin to an on-premises living requirement.  When Plaintiff Pflaster drove the Bucket Trucks for personal purposes, they were required to adhere to numerous restrictions including, among other things: that they travel alone; that they refrain from eating; that they pull over before making outgoing telephone calls (even if they had hands-free capability); and that they perform extensive maintenance and safety checks <u>every time</u> they began driving the trucks or <u>any time</u> that they drove in reverse gear. Further, Plaintiff Pflaster and the class were required to conduct inspections on the trucks and maintain them on a daily basis, even on days on which they did not work one of their regular workweek shifts, including days on which they were not on-call.

57.    For the week-long periods that Plaintiff Pflaster and the class worked on-call, the time that they worked on-call was in excess of 40 hours per week and compensable at 1.5 time the their regular rate of pay.

58.    Further, Plaintiff Pflaster and the class took the Bucket Trucks home after every shift, even when they were not working on-call.  When Plaintiff Pflaster and the class took the Bucket Trucks home, Charter required them to perform "Circle of Safety" inspections: (1) <u>every time</u> they drove the Bucket Trucks after leaving them unattended; or (2) <u>any time</u> they drove in reverse gear.  All such "Circle of Safety" inspections conducted outside of their regularly-scheduled work shifts was additional work in excess of their regular 40-hour workweek. Likewise, Charter's requirement that Plaintiff Pflaster and the class perform daily maintenance and safety inspections and cleaning of the Bucket Trucks outside of their regularly-scheduled work shifts was

CLASS ACTION COMPLAINT

additional work in excess of their regular 40-hour workweek.

59.     At all times relevant hereto, Charter failed to pay Plaintiff Pflaster and the class minimum wages and overtime/double-time compensation in violation of *California Labor Code* sections 510 § 1194, § 1197, and § 1198, and the applicable IWC wage orders.

60.     Plaintiff Pflaster and the class worked in excess of 40 hours per week for Charter but were not properly paid overtime wages in violation of the *California Labor Code*.   Through its actions, policies and practices, Charter violated the *California Labor Code* by regularly and repeatedly failing to compensate them for all actual overtime worked at the proper rate of pay.   Plaintiff Pflaster and the class seek such minimum wages and overtime/double-time wages owed to them for the applicable statutory period measured backward from the date of the filing of the initial Complaint in this matter.

61.     The exact amount of minimum wages and overtime/double-time owed will not be fully ascertained until discovery is completed.   Until Defendant produces the necessary documents for an accounting, Plaintiff Pflaster and the class are unable to determine the exact amount of said wages.

62.     *California Labor Code* section 218.6 states, "[I]n any action brought for the nonpayment of wages, the court shall award interest on all due and unpaid wages at the rate of interest specified in subdivision (b) of Section 3289 of the Civil Code, which shall accrue from the date that the wages were due and payable as provided in Part 1 (commencing with Section 200) of Division 2."   Plaintiff Pflaster and the class seek such interest on all minimum wages owed to them for the three-year period measured backward from the date of the filing of the initial Complaint in this matter.

63.     Pursuant to *California Labor Code* section 1194, Plaintiff Pflaster and the class are entitled to recover unpaid minimum wages and overtime/double-time wages, as well as attorney's fees, costs, and interest.

64.     Plaintiff Pflaster and the class seek liquidated damages in an amount

CLASS ACTION COMPLAINT

equal to the minimum wages due to them under *California Labor Code* section 1194.2.

65.    As a direct and proximate cause of Charter's unlawful conduct, Plaintiff Pflaster and the class have suffered and will continue to suffer damages in amounts which are presently unknown to Plaintiff Pflaster and the class but which exceed the jurisdictional limits of this Court, and which will be ascertained according to proof at trial.

## COUNT III

### VIOLATION OF CALIFORNIA LABOR CODE § 210
### Failure to Pay Timely Pay Wages Due
### (Against Defendant Charter Communications, LLC)

66.    Plaintiff Pflaster and the class reallege and incorporate by reference the allegations of the above-numbered paragraphs as through fully set forth herein.

67.    Charter failed to timely pay Plaintiff Pflaster and the class all minimum wages and overtime/double-time compensation due in violation of *California Labor Code* § 210.

68.    Pursuant to *California Labor Code* section 210, Plaintiff Pflaster and the class are each entitled to recover the following civil penalties: $100 for the initial violation; and $200 for each subsequent violation plus a penalty of 25% the amount unlawfully withheld.

## COUNT IV

### VIOLATION OF CAL. LABOR CODE § 226(a)
### Failure to Provide Accurate Itemized Wage Statements
### (Against Defendant Charter Communications, LLC)

69.    Plaintiff Pflaster and the class reallege and incorporate by reference the allegations of the above-numbered paragraphs as through fully set forth herein.

70.    Charter intentionally failed to furnish to Plaintiff Pflaster and the class, upon each payment of wages, itemized statements accurately showing, total hours worked, the applicable hourly rates in effect during each pay period and the

corresponding hours worked at each hourly rate.

35.    Plaintiff Pflaster and the class were damaged by Charter's failures because, among other things, the failures led Plaintiff Pflaster and the class to believe that they were not entitled to be paid overtime, and because the failures hindered them from determining the amounts of overtime wages owed to them.

36.    Pursuant to *California Labor Code* section 226(a), Plaintiff Pflaster and the class are each entitled to the following: (1) $50 for the initial pay period in which the violation occurred and $100 per pay period for each additional violation, up to $4,000 per employee, plus an award of reasonable attorney's fees and costs.

**COUNT V**
**FOR UNFAIR COMPETITION**
**Cal. Bus. & Prof. Code § 17200,** *et seq.*
**(Against Defendant Charter Communications, LLC)**

37.    Plaintiff Pflaster and the class reallege and incorporate by reference the allegations of the above-numbered paragraphs as through fully set forth herein.

38.    California's Unfair Competition Law (Bus. & Prof. Code §17200 *et seq.*) (the "UCL") prohibits acts of "unfair competition," including any unlawful, unfair, fraudulent, or deceptive business act or practice.

39.    Charter is a "person" as that term is defined under the UCL.

40.    Since at least in or about May 2017,  and at all relevant times hereto, by and through the conduct described herein, Charter has engaged in unfair and unlawful business practices by failing to properly pay Plaintiff Pflaster and the class for minimum wages and overtime compensation.

41.    As a direct and proximate result of Charter's unfair business practices, Plaintiff Pflaster and the class have been injured in fact and have lost money or property, and Charter has been unjustly enriched.

42.    Plaintiff Pflaster and the class are entitled to relief, including full restitution and/or disgorgement of all money and property of which Plaintiff Pflaster and the class have been deprived and which has been wrongfully retained by Charter.

43.    Plaintiff Pflaster and the class are further entitled to, and do, seek a declaration that the above-described business practices are unfair and unlawful and an injunction restraining Charter from further engaging in any of the above-described business practices.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiffs and the class members request that this Court:

1.    Certify the claims set forth above as a respective state law class actions pursuant to Rule 23 of the *Federal Rules of Civil Procedure*;

2.    Award Plaintiff Freeze and the class members their unpaid minimum wages as provided under the *Texas Labor Code*;

3.    Award Plaintiff Pflaster and the class members liquidated damages, statutory penalties, and all other available relief provided under the *California Labor Code*.

4.    Award Plaintiff Pflaster and the class members their unpaid minimum, actual, and overtime wages as provided under the *California Labor Code*;

5.    Award Plaintiff Pflaster and the class members liquidated damages, statutory penalties, and all other available relief provided under the *California Labor Code*.

6.    Award Plaintiffs and the class members attorney's fees, costs, and interest; and

7.    Award such other further relief as the Court deems just and proper.

//
//
//
//
//
//

CLASS ACTION COMPLAINT

## DEMAND FOR JURY TRIAL

Plaintiffs and the class members respectfully demand a jury trial on all claims triable.

Date: July 15, 2021

FERGUSON CASE ORR PATERSON LLP

Max R. Engelhardt
Attorneys for Plaintiffs
JAMES LEE FREEZE and
GARY PFLASTER, on behalf of
themselves and a class of employees
and/or former employees similarly
situated

CLASS ACTION COMPLAINT